IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| FABIAN GREY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 9:18-cv-01764-DCN |
| | ) | |
| UR JADDOU, *Director of United States* | ) | **ORDER** |
| *Citizenship and Immigration Services*, and | ) | |
| UNITED STATES CITIZEN AND | ) | |
| IMMIGRATION SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

The following matter is before the court on plaintiff Fabian Grey's ("Grey")

motion for summary judgment, ECF No. 104, and defendants Ur Jaddou and United

States Citizenship and Immigration Services' ("USCIS") (together, "defendants") motion

for summary judgment, ECF No. 105. For the reasons set forth below, the court grants

defendants' motion and denies Grey's motion.

## I.  BACKGROUND

This matter arises out of Grey's application for naturalization. Grey is a Jamaican

citizen who first entered the United States on a work visa on November 30, 2005. On

February 2, 2006, Grey married a United States citizen, Trinia Smalls ("Smalls"), and

Smalls petitioned for a marriage-based green card for Grey. Based on this petition, Grey

became a conditional lawful permanent resident in January 2007. About two years later,

Grey and Smalls petitioned to have the condition on Grey's residency removed, which

USCIS granted, making Grey a lawful permanent resident. On February 17, 2016, Grey

filed an application for naturalization, also called a "Form N-400." On his Form N-400,

Grey disclosed one prior criminal conviction from 2009 for simple assault and battery. ECF No. 70-1 at 15.

On September 7, 2017, USCIS conducted Grey's naturalization interview, which was led by an immigration service officer ("ISO"). At his interview, Grey disclosed a second arrest, which related to an incident that took place on February 18, 2016 (the "February 2016 incident"), just after Grey filed his application. Id. According to the ISO's notes, Grey stated at his naturalization interview that he was arrested for filing a false police report after he called 9-1-1 "to report a fight." Id. at 16. The day after the interview, USCIS ran a "Law Enforcement Report" on Grey, which revealed his February 2016 arrest for "misprision of a felony," a state charge that was later reduced to "filing a false police report." ECF No. 95-2 at 1; ECF No. 70-6, Grey Dep. 57:13–60:13. However, USCIS failed to pursue Grey's February 2016 arrest as a ground for denying his application for almost three years, until defendants deposed Grey for this case in August 2020.

After a substantial delay in hearing back about his application, Grey filed this suit on June 27, 2018, asking the court to declare him eligible for naturalization and order USCIS to naturalize him pursuant to 8 U.S.C. § 1447(b).[1] On August 3, 2018, USCIS issued a Notice of Intent to Deny to Grey, indicating that it intended to deny Grey's naturalization application based on marriage fraud and providing Grey with thirty days to respond with evidence that his application should not be denied. USCIS then filed a

---

[1] Grey subsequently amended his complaint to add USCIS as a defendant and a cause of action seeking an order compelling USCIS to respond to his pending Freedom of Information Act ("FOIA") request pursuant to 5 U.S.C. § 552(a)(4)(B). The court resolved Grey's FOIA claim in its prior summary judgment order. ECF No. 94.

motion to remand Grey's application for naturalization to USCIS for adjudication, which the court denied.  ECF No. 26.

On August 28, 2020, defendants took Grey's deposition, during which Grey gave a more detailed recounting of his February 2016 arrest.  According to defendants, Grey's "characterization of his misprision of a felony charge at his August 28, 2020 deposition lacked credibility and led USCIS to seek further information about the charge."  ECF No. 93 at 3.  In their subsequent investigation, on September 17, 2020, defendants obtained a police report detailing the circumstances of Grey's February 2016 arrest from the Beaufort County Solicitor's Office (the "2016 Police Report").  ECF No. 70-4.  On October 28, 2020, defendants obtained more evidence from the Beaufort County Solicitor's Office concerning Grey's February 2016 arrest in the form of audio and video recordings of police interviews with Grey conducted shortly after his arrest (the "2016 Audio/Video Recordings").  ECF Nos. 87-1, 87-2, 87-3.  Defendants supplemented their first motion for summary judgment with the 2016 Police Report and the 2016 Audio/Video Recordings, suggesting that USCIS was formally revising their basis for denying Grey's application based on the February 2016 arrest.  See generally ECF No. 87.

On April 8, 2021, the court dismissed the parties' respective motions for summary judgment until Grey had an opportunity to conduct his own discovery on the newly-obtained 2016 Police Report and the 2016 Audio/Video Recordings.  ECF No. 97.  In February 2023, the parties indicated that such discovery had concluded, and the court entered an amended scheduling order.  ECF Nos. 101, 102.

On March 2, 2023, Grey filed his motion for summary judgment. ECF No. 104. On March 29, 2023, defendants filed their motion for summary judgment, which doubled as a response to Grey's motion. ECF Nos. 105, 106.[2] On April 21, 2023, Grey filed his response to defendants' motion for summary judgment, which doubled as a reply in support of Grey's own motion. ECF No. 110. On May 1, 2023, defendants replied in support of their motion for summary judgment. ECF No. 113. On August 23, 2023, the court held a hearing on both motions. ECF No. 117. As such, the motions have been fully briefed and are now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the

---

[2] ECF Nos. 105 and 106 are the same document, and for simplicity, the court only references the document as "ECF No. 105" herein.

4

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

## III. DISCUSSION

Both parties move for summary judgment on Grey's claim that he is eligible for naturalization. Before turning to the parties' arguments, the court provides a brief overview of the law governing naturalization claims and a federal court's role in resolving them.

The Immigration and Nationality Act ("INA") provides an applicant for naturalization an avenue to seek judicial review after his or her application has been denied.[3] Pursuant to the statute:

> A person whose application for naturalization under this subchapter is denied . . . may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c). Courts have long confirmed that judicial review of a naturalization application is "always available and is de novo." Aparicio v. Blakeway, 302 F.3d 437, 445 (5th Cir. 2002). Because its review is de novo, "the [c]ourt is not limited to the facts

---

[3] Normally, a court receives jurisdiction over an application for naturalization under 8 U.S.C. § 1421(c) after an applicant has his or her application denied and requests a hearing before an immigration officer. In this case, however, the court asserted jurisdiction over Grey's application under U.S.C. § 1447(b) because the USCIS failed to resolve it within the statutory timeframe. See ECF No. 26. As such, the court has the authority to resolve Grey's application in the first instance without a decision from the USCIS. Importantly though, because the court engages in a de novo review of a naturalization application whether it comes before the court by way of § 1421(c) or § 1447(b), the same law governing judicial review of naturalization applications applies regardless of which statute confers jurisdiction.

5

in the administrative record, and in fact is permitted to engage in its own de novo fact

finding." Nesari v. Taylor, 806 F. Supp. 2d 848, 867 (E.D. Va. 2011) (citation omitted).

The INA sets out the requirements a lawful permanent resident must satisfy to

naturalize. 8 U.S.C. § 1427(a). The parties generally[4] agree that to qualify for

naturalization, an applicant must:

1. Be 18 years of age or older at the time of filing Form N-400;

2. Be lawfully admitted for permanent residence;

3. Be a lawful permanent resident for at least 5 years at the time of filing Form N-400;

4. Demonstrate good moral character for at least 5 years prior to the Form N-400 filing date, and during the period leading to administration of the Oath of Allegiance;

5. Have resided continuously in the United States for at least 5 years as a lawful permanent resident before filing Form N-400;

6. Have resided for at least 3 months in the State or USCIS District where residence is claimed before filing Form N-400;

7. Have resided continuously in the United States from the date of filing Form N-400 up to the time of administration of the Oath of Allegiance;

8. Be physically present in the United States for a least 2 ½ years at the time of filing Form N-400;

9. Demonstrate a basic knowledge of U.S. history and government;

10. Demonstrate the ability to read, write, and speak words in ordinary usage in the English language; and

11. Establish an attachment to the principles of the U.S. Constitution and be disposed to the good order and happiness of the United States.

---

[4] Grey provides the requirements under INA § 319, rather than § 316. The "good moral character" requirement, which is the only requirement at issue, is found in both statutes, although § 319 specifies a three-year lookback period. But as defendants point out, Grey conceded that he applied for naturalization under § 316. ECF No. 105 at 9 n.4 (citing ECF No. 104 at 2–4).

ECF No. 8–9 (citing INA § 316 and 8 U.S.C. § 1427) (emphasis added).

The good moral character requirement (emphasized above) is the only requirement at issue here; defendants do not contest Grey's ability to meet the remaining requirements. An applicant may be naturalized only if he "has been and still is a person of good moral character." 8 U.S.C. § 1427(a)(3). The "good moral character" requirement applies with respect to the five-year period immediately preceding the applicant's filing and continues to the time the applicant takes the oath of allegiance as a United States citizen. Id.; 8 C.F.R. § 316.10(a)(1). It is "universally accepted" that an applicant seeking to obtain United States citizenship bears the burden "to show his eligibility for citizenship in every respect," INS v. Pangilinan, 486 U.S. 875, 886 (1988), including his or her good moral character. 8 U.S.C. § 1427(e) ("[T]he applicant has . . . the burden of establishing good moral character and the other qualifications of citizenship specified in subsection (a) of this section . . . .").

Courts have the power to confer citizenship only "in strict compliance with the terms of an authorizing statute." Cody v. Caterisano, 631 F.3d 136, 142 (4th Cir. 2011); see also Pangilinan, 486 U.S. at 884 ("Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare."). The applicant must demonstrate that he or she meets all of the requirements for naturalization by a preponderance of the evidence, 8 C.F.R. § 316.2(b), and all doubts regarding an applicant's eligibility for naturalization "should be resolved in favor of the United States and against the [applicant]," Berenyi v. Dist.

<u>Dir., Immigr. & Naturalization Serv.</u>, 385 U.S. 630, 637 (1967) (citation omitted).[5]  With this law firmly in mind, the court turns to the parties' arguments on summary judgment.

In their motion, defendants maintain that the court should deny Grey's application for naturalization because Grey "cannot establish his 'good moral character' under 8 U.S.C. § 1427(a)(3)."  ECF No. 105 at 1.  Conversely, Grey argues that he has demonstrated his good moral character as a matter of law.  ECF No. 104 at 3–4.  In particular, the government contends that Grey is precluded from proving his good moral character for two reasons: (1) Grey gave false testimony for the purpose of obtaining an immigration benefit at his deposition for this case, and (2) Grey committed an unlawful act by lying to the police about the murder of his co-worker.  The court addresses these arguments in turn, ultimately finding that both the false statements Grey made during his deposition and the underlying act of lying to the police in 2016 preclude Grey from showing he has met the good-moral-character requirement.

### A.  False Testimony

Grey filed his Form N-400 on February 17, 2016.  ECF No. 70-1.  The very next day, Grey was on his way to work when he allegedly saw one of his co-workers lying on the ground with a gunshot wound and called 9-1-1.  On February 18, 19, and 29, 2016, Grey was interviewed by officers with the Beaufort County Sheriff's Office ("BCSO") who were investigating the February 2016 incident.  On September 7, 2017, USCIS

---

[5] In 1996, the Fourth Circuit indicated that an applicant for naturalization must satisfy the INA's requirements by "clear and convincing evidence."  <u>El-Ali v. Carroll</u>, 83 F.3d 414 (4th Cir. 1996).  The court finds that the preponderance-of-the-evidence standard carries the day for two reasons.  First, <u>El-Ali</u> predates the regulation's use of the phrase "by a preponderance of the evidence," and second, in a more recent decision, the Fourth Circuit embraced the modern version of the regulation and its preponderance-of-the-evidence standard, <u>United States v. Sadiq</u>, 271 F. App'x 290, 295 (4th Cir. 2007).

conducted Grey's naturalization interview.  The ISO placed Grey under oath at the outset

of the naturalization interview.  Finally, defendants deposed Grey for this case nearly

three years later, on August 28, 2020, during which Grey was under oath.  ECF No. 70-6,

Grey Dep. at 4.

Defendants argue that Grey provided false testimony at his deposition[6] about his

criminal history, and the false testimony precludes the court from finding that Grey is a

person of good moral character.  Congress has erected several statutory bars to

naturalization based on conduct it has deemed irreconcilable with good moral character.

See 8 U.S.C. § 1101(f).  As relevant here, the INA provides:

> No person shall be regarded as, or found to be, a person of good moral
> character who, during the period for which good moral character was
> required to be established is, or was . . . one who has given false testimony
> for the purpose of obtaining any benefits under this chapter.

8 U.S.C. § 1101(f)(6); see also 8 C.F.R. § 316.10(b)(2)(vi).  Section 1101(f)(6) therefore

bars a finding of good moral character if the applicant "made a statement that (i) qualifies

as testimony under § 1101(f)(6), (ii) was false, (iii) was made for the purpose of

obtaining immigration benefit, and (iv) was made within the five-year statutory window."

Astrat v. Barr, 399 F. Supp. 3d 505, 520 (E.D. Va. 2019).  The regulations promulgated

under the rule further explain that the disqualifying testimony need not be material to the

benefits determination.  8 C.F.R. § 316.10(b)(2)(vi); see also Kungys v. United States,

---

[6] The court presumes that defendants focus on Grey's deposition testimony in lieu of his statements given during his naturalization interview based on the five-year lookback period.  As the court reads it, however, 8 U.S.C. § 1427(a)(3) provides that the five-year statutory period is calculated from the application date and continues to the time the applicant takes an oath of allegiance.  It appears to the court that both the naturalization interview and deposition fall within that period.  In any event, the court finds that Grey gave false statements in his deposition, rendering the naturalization interview somewhat immaterial.

485 U.S. 759, 779–80 (1988) ("Literally read, [§1101(f)(6)] denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits. We think it means precisely what it says."). But the Supreme Court has made clear that "testimony" within the meaning of § 1101(f)(6) "is limited to oral statements made under oath." Kungys, 485 U.S. at 780.

On his N-400 Form, Grey disclosed one prior criminal conviction from 2009 for simple assault and battery. ECF No. 70-1 at 15. After he filed the form but before his naturalization interview, Grey was arrested on February 29, 2016, for his involvement in the February 2016 incident. ECF No. 70-5 at 1. At his naturalization interview on September 7, 2017, Grey disclosed this second arrest. Id. According to the ISO's notes, Grey stated at his naturalization interview that the arrest was for filing a false police report after he called 9-1-1 to report a fight. Id. at 16. On August 28, 2020, defendants took Grey's deposition for this case, during which Grey appeared to give a more detailed recounting of the February 2016 incident. According to his deposition testimony, on February 18, 2016, Grey was in his parked car waiting to catch a boat to work when he saw two of his employees on the boat dock, later identified as Allen Haynes ("Haynes") and Darnell Williams ("Williams"). Grey Dep. at 53:12–20. When Grey emerged from his car, he "saw one guy [] laying on the ground" but claimed not to "know what happened prior to what happened with them." Id. at 53:21–24. Grey explained that "I was asking for help, but the guy's a prankster so I didn't take him serious. So when I found out he really got hurt, I ran to Haig Point and I called 911." Id. at 53:24–54:2.

Grey also testified in the deposition that "the first thing he saw" when he got out of his car was the victim, Williams, "lay[ing] down on the ground kind of limp," id. at 55:6–12, and he "wasn't there" when Williams was shot, id. at 54:9–11. Grey also clarified that he only saw Williams on the ground and never saw the shooter, Haynes. Id. at 56:6–9 ("I only saw the one guy. The one guy that got shot, I only saw him at the time."). Grey claimed that when the police arrived and interviewed him, Grey reported "the full extent of [his] knowledge," id. at 57:11–22, but they kept accusing him of "know[ing] who did it" because he had been present, id. at 54:3–9. As a result of his report to police, Grey testified that he was charged with "misprision of a felony," which was later reduced to "filing a false police report." Id. at 59:13–60:13.

Following Grey's deposition, defendants began gathering evidence about the February 2016 incident and eventually presented the evidence to this court as a basis for denying Grey's application. Defendants initially produced a police report from the February 2016 incident. The report notes that officers first interviewed Grey on the date of the incident, February 18, 2016. ECF No. 70-4 at 27. Grey's statements in the February 18 interview largely comport with his deposition testimony in this case. According to the report, Grey told officers that he was sitting in his car when he saw Williams walk by on his phone. Id. Williams spoke briefly to Grey before continuing to walk towards the dock. Id. Grey eventually heard a "pop" and walked toward the dock, where he saw Williams lying on the ground. Id. Grey thought it was a joke at first, but when Williams asked Grey to call 911, Grey complied. Id. at 27–28. On February 19, 2016, an officer conducted a second interview with Grey, which the report summarizes.

Id. at 28–29.  In the second interview, Grey provided a similar account, with a few additional, immaterial details.  Id.

Later entries in the 2016 Police Report reveal that Grey then changed his story.  In a third interview on February 29, 2016, which included a walkthrough of the parking lot where the shooting took place, an officer confronted Grey with an inconsistency in his story.  Id. at 23.  Grey had previously stated that he witnessed Williams on the phone as he walked by Grey's car.  When the officer confronted Grey with the fact that Williams's phone records did not show him on the phone at that time, Grey admitted to seeing more than he originally indicated.  Id.  According to the report, after he was read his Miranda rights, Grey stated he had seen that Williams and Haynes "were playing and Williams got shot."  Id.  Grey then asked to be taken to the crime scene to show the officers "exactly what happened."  Id. at 24.  After the officer accompanied Grey to the scene, Grey again indicated that he had been untruthful, admitting he saw Williams approach Haynes's car. Id.  Grey then stated that he heard Haynes, the shooter, say "this man plays too much and this is what happens."  Id.  Grey heard a pop and rushed to Williams.  Id.  Haynes drove away and later called Grey to ask if Williams "was going to make it."  Id.  Williams later died from the gunshot wound.

According to the report, Grey stated that "he did not originally tell the truth because he was scared."  Id.  Grey told the officer that he could not get involved because his parents were in poor health and depended on him, and he feared retaliation from Haynes.  Id. at 23–24.  The report also stated that Grey was charged with "Mispris[i]on of a Felony (Neglect in Reporting a Crime)."  Id. at 24.  State court records confirm that the

charge was reduced to "filing a false police report." ECF No 70-5. Grey subsequently participated in a pretrial intervention program and was not convicted of the charge. Id.[7]

Defendants later obtained and produced the audio and video recordings of Grey's interviews, which largely confirmed the notes taken in the police report. The 2016 Audio/Video Recordings[8] confirm that Grey's deposition testimony comported with the original version of events he first told police in interviews on February 18 and 19, 2016 and in the first part of the interview on February 29, 2016. ECF No. 87-1 at 12–19, 48–53. For example, Grey stated during the February 19 interview that he could not say whether Haynes shot Williams. ECF No. 87-1 at 91:13–15 (Feb. 19 interview transcript). In the same interview, Grey testified that he did not "see any conflict between the two . . . in the parking lot." Id. at 101:24–102:5. During the latter half of the February 29 interview, however, Grey admitted on video that he saw more than he originally stated:

> But when I get out, I saw Allen [Haynes] and he waved to me, when I went to the dumpster. So when I came around, I heard the pop, because Darnell [Williams] and -- was like -- this is the car window. And Darnell was like on Allen car. You see what I'm saying? So, when I heard the pop, that's when I, I -- right when I get out my car, I heard the pop. When I went to the dumpster and came around, and Allen was like, oh, shit. Oh, shit. You play too much. And that's what all go down, be honest to you.

---

[7] According to the Beaufort County Public Index, Haynes was indicted for murder and pled guilty to manslaughter. He was sentenced to five years of imprisonment. South Carolina v. Haynes, Case No. 2016A0710300083 (Beaufort Cnty. Ct. Gen. Sess. Mar. 1, 2016).

[8] As established by the court's prior order, ECF No. 97, the 2016 Police Report and the 2016 Audio/Video Recordings are both properly before the court despite not being produced during the discovery period because Grey was subsequently permitted to conduct additional discovery related to the evidence. Additionally, Grey previously objected to the 2016 Police Report as hearsay within hearsay. ECF No. 77 at 7. Grey appears to have abandoned the argument, but to the extent he maintains the objection, the 2016 Police Report is admissible because the first level of hearsay—the police report itself—is a business record, and the second level of hearsay—Grey's statements within the report—are admissible as statements by a party opponent.

ECF No. 87-2 at 21:20–22:4. Grey confirmed that he was present when the victim was shot. Id. at 24:4–6 (A: I didn't -- yeah, I heard the shot. I didn't see, like, him point the gun or anything. But I was -- I mean, I was there."); id. at 24:13–16 ("Darnell was in front of me. It was like . . . . a gap.").

Following the interview at the station house, Grey accompanied the officer to the parking lot to show him what had happened on the day of the shooting. During the walkthrough, Grey stated that he had walked with Williams until they reached Haynes's car. ECF No. 87-3 at 4:20–25. Williams then "[c]ut in front of" Grey to talk to Haynes, and Grey saw Williams place his hands on top of Haynes's car. Id. at 5:22–6:14. Grey turned and walked away, heard a pop, and turned to see Williams fall. Id. at 7:6–14. Right before, he had heard Haynes "tell him to stop the playing. This is what playing costs." Id. at 7:20–23. After Grey went to help Williams, he saw Haynes "pull out and drive away." Id. at 8:10–12.

Between the police report and the interview transcripts, defendants note several other facts from Grey's testimony that show Grey lied in his 2020 deposition. These include testimony that:

- Grey knew Haynes always had a gun, ECF No. 87-2 at 14;
- Grey thought Haynes "did it," that Haynes "was there," and that he saw Haynes's car, id. at 16–17;
- Haynes called Grey after the shooting, and asked if Williams was going to make it, id. at 17, 39;
- Haynes's car was parked in the parking lot, and he saw Haynes wave to him, id. at 21;
- Williams was at Haynes's driver's side car window, with his hands on the car, and Grey was there when Grey heard the shot, id. at 23–24, 36, 55;
- Grey was ten feet away when he heard the gun fire, and he saw Williams fall, id. at 36, 49;
- Grey saw Haynes got out of his car after the gunfire, then get back in his car and leave, id. at 36–37;

14

- After the shooting, on February 18, Grey attempted to talk to Haynes about the shooting, but Haynes ignored him, id. at 42;
- Williams told Grey he could not believe that "he shot me," id. at 43.

Grey presents two arguments in response. First, Grey claims that there are no contradictions between his interview statements and his deposition testimony. Specifically, Grey argues that when deposed, he was never asked to "include all of the same details" that he gave in the February 29, 2016 interview, suggesting that Grey only gave answers that directly responded to the government's questions—and nothing more. ECF No. 110 at 5. In other words, Grey claims that although his deposition testimony "may not have been as complete as his testimony on February 29, it did not contradict that testimony." Id. As an example, Grey offers that when deposed, he testified that he had been in the parking lot during the shooting, which was "not untrue." Id.

The court disagrees that Grey's deposition testimony was merely "ambiguous" and that he merely omitted details. Id. Grey's deposition testimony, as reflected in the discussion above, did not involve mere ambiguities; Grey provided several false statements. He testified in his deposition that (1) "the first thing he saw" was the victim laying on the ground, Grey Dep. 55:6–14; (2) he "wasn't there" when the victim was shot, id. at 54:3–11; and (3) he didn't know "what happened prior" to the incident between Williams and Haynes, id. at 54:21–22; and (4) he "only saw the one guy [Williams]" and never saw the shooter, id. at 56:6–9. Again, based on the 2016 Police Report and 2016 Audio/Video Recordings, these were all unequivocally false statements. Grey saw Williams and Haynes together prior to the shooting, and he was present when Haynes shot Williams. ECF No 70-4 at 23–24. Grey witnessed Haynes leaving in his car immediately afterwards, and Haynes later called Grey after the shooting. ECF No. 87-1

at 24.  Grey also pointedly affirmed at his deposition that he gave "the full extent of [his] knowledge to the police" when interviewed at the scene, Grey Dep. at 57:11–14, but that was untrue because he later provided an accurate account[9] at the station house.  Based on the evidence, the court finds that no reasonable juror could conclude that Grey did not provide false statements in his deposition.

Second, Grey argues that there is no evidence that Grey's statements were made "with an intent to obtain an immigration benefit," as required by statute.  ECF No. 110 at 4.  Grey makes much of the fact that he purportedly lacked the <u>subjective</u> intent to provide false statements for an immigration benefit at his deposition.[10]  <u>See also</u> <u>Kungys</u>, 485 U.S. at 780 (discussing the subjective intent standard).  Grey acknowledged at the hearing that courts have deduced subjective intent when an applicant makes false statements in a naturalization interview but argued that the same cannot be said for depositions.  Based on the posture of this case, however, Grey's deposition functioned as an information-gathering interview.  Grey brought this action so that the court could

---

[9] There appears to be little question about it, but the court finds that Grey's statements given on February 29, 2016—as opposed to the statements given in his 2020 interview—have the greatest indicia of reliability as they were (1) given immediately after Grey was provided with information that proved his original story no longer withheld scrutiny, (2) given after Grey was informed about the importance of his testimony, and (3) given after a Miranda warning.  ECF No. 9, 12, 14–19, 24, 42, 48–53.  Grey also confessed to lying in his prior interview statements—which resemble the account he gave in his deposition—and explained that he had been scared in the immediate days following the shooting.  There is no genuine dispute of material fact that Grey's statements reverting to his previous, untrue account constituted false testimony.

[10] To the extent Grey also argues that his statements to the BCSO in 2016 were not given to obtain an immigration benefit, that argument misses the mark.  <u>See</u> <u>id.</u> ("[T]here is no evidence that Mr. Grey gave false 'Mirandized statements' to Beaufort County officers 'with an intent to obtain an immigration benefit.'") (footnote and emphases omitted).  The issue is whether his testimony at the deposition was made with an intent to obtain an immigration benefit.

declare him eligible for naturalization in lieu of a USCIS decision.  Certainly, he was aware that his testimony would bear on the court's decision.  Just as Grey filed a FOIA request to identify and "[r]espond to allegations" made by the USCIS, ECF No. 33 at 1, he was aware that the USCIS was similarly gathering evidence against him.  The court finds that Grey gave his deposition statements with the subjective intent to obtain an immigration benefit.  Accord. Davis v. Sessions, 293 F. Supp. 3d 678, 682 (S.D. Tex. 2018) (finding that an applicant had a subjective intent to obtain immigration benefits where he sought "to improve the chances that his naturalization application would be granted").

Finally, to the extent Grey argues that the February 2016 incident should have had no bearing on his naturalization application because the USCIS originally sought to deny his application based on marriage fraud and failure to pay child support, the court is unconvinced.  As the court explained in a previous order, the law does not limit defendants to theories advanced in their Notice to Deny.  ECF No. 94 at 6 (citing Injeti v. U.S. Citizenship & Immigr. Servs., 737 F.3d 311, 315 (4th Cir. 2013)).  Moreover, the prohibition on false testimony "applies regardless of whether the information provided in the false testimony was material."  Mukarram v. Collett, 649 F. Supp. 2d 418, 421 (D. Md. 2009) (quoting 8 C.F.R. § 316.10(b)(2)(vi)).  Whichever way the court slices it, Grey provided false testimony with an intent to obtain an immigration benefit.

In sum, the court finds there is no legitimate dispute that Grey provided statements in his deposition that constituted "false testimony" under § 1101(f)(6), statutorily barring the court from finding that Grey "has been and still is a person of good moral character."  8 U.S.C. § 1427(a)(3).  The court is bound by the INA to deny the

conferral of citizenship if an applicant fails to strictly comply with the statutory requirements. See Cody, 631 F.3d at 142 (explaining that courts have the authority to confer citizenship only "in strict compliance with the terms of an authorizing statute."); see also Pangilinan, 486 U.S. at 884 ("Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare."). Grey is statutorily barred from meeting the good moral character requirement. Based on the evidence presented, summary judgment is warranted in favor of defendants.

### B. Unlawful Act for the 2016 Incident

Defendants also argue that Grey cannot satisfy § 1427(a)(3)'s good moral character requirement because even without considering whether he subsequently lied about the February 2016 incident in his 2020 deposition, Grey's involvement in the incident itself constitutes an "unlawful act," which militates against finding that Grey possesses good moral character. ECF No. 105 at 14. In response, Grey argues that because his charge for filing a false police report was expunged, there is no "absolute bar to naturalization," and it is instead an issue of fact as to whether Grey's conduct rose to the level of constituting an unlawful act. ECF No. 110 at 2. The court's determination above that Grey rendered false testimony is dispositive on the good moral character requirement, but for completeness, the court considers the issue below.

An applicant's unlawful act can preclude a finding of good moral character. 8 U.S.C. § 1101(f), which designates certain conduct as indicative of poor moral character, includes a catchall provision: "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of

18

good moral character."  Armed with the authority of § 1101(f), the Department of

Homeland Security promulgated regulation 8 C.F.R. § 316.10, which states that "[u]nless

the applicant establishes extenuating circumstances, the applicant shall be found to lack

good moral character if, during the statutory period, the applicant . . . [c]ommitted unlawful

acts that adversely reflect upon the applicant's moral character."  8 C.F.R.

§ 316.10(b)(3)(iii).[11]  The regulations further instruct the USCIS to "evaluate claims of

good moral character on a case-by-case basis," using "the standards of the average citizen

in the community of residence" as a benchmark.  Id. § 316.10(a)(2).

      Defendants contend that Grey's false report to the police after the 2016 incident

constitutes an unlawful act that adversely reflects upon his moral character.  Defendants

specifically note that Grey's lies to the investigating officers "led to prosecution and

[Grey's] participation in a pre-trial intervention program," and the state court proceedings

"sufficiently establish that Grey committed an unlawful act."  ECF No. 105 at 13.  In

response, Grey first argues that his charge for filing a false police report was expunged.

Defendants are quick to respond that the expungement was not due to any "procedural or

substantive defect in the underlying proceeding."  ECF No. 113 at 2 n.2.  Regardless,

Grey's argument rests on a flawed premise.  Whether Grey's filing of a false police report

constitutes an unlawful act is based on the nature of the conduct, not whether he pled

guilty to the crime.  The regulations specifically state that an applicant need not be

convicted of an act for that act to reflect negatively on his moral character.  8 C.F.R.

§ 316.10(b)(2)(iv) (stating that an applicant's commission of an unlawful act may be a

---

[11] The Ninth Circuit found 8 C.F.R. § 316.10(b)(3)(iii) to be a permissible agency interpretation of 8 U.S.C. § 1001(f) and therefore constitutional.  United States v. Dang, 488 F.3d 1135, 1139 (9th Cir. 2007).  The court applies the regulation here.

valid basis for denial even where "there was never a formal charge, indictment, arrest, or conviction"); see also United States v. Jean-Baptiste, 395 F.3d 1190, 1193, 1196 (11th Cir. 2005) (finding an absence of good moral character based on the applicant's commission of offenses); Meyersiek v. U.S. Citizenship & Immigr. Servs., 445 F. Supp. 2d 202, 205 (D.R.I. 2006) ("[B]ad acts that [] rise to the level of criminality, regardless of whether a criminal prosecution was actually initiated."). Based on the discussion under the false statement bar, there is no genuine dispute that Grey initially gave a false report of the 2016 incident to the police, and such conduct falls below "the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2).

Second, Grey argues it is "a question of fact whether [his] allegedly false statements 'adversely reflect upon' his moral character" since there were extenuating circumstances that excused his conduct. ECF No. 110 at 3 (quoting 8 C.F.R. § 316.10(b)(3)(iii)). Specifically, Grey explains that his actions were motivated by a fear of retaliation. Id. In his response to defendants' first motion for summary judgment, Grey also argued that when he gave the statements to police, he was still experiencing trauma from discovering a wounded friend who had been shot by another friend. ECF No. 77 at 11. Fear of retaliation could conceivably "render [the] crime less reprehensible than it otherwise would be," thus constituting an extenuating circumstance. United States v. Suarez, 664 F.3d 655, 662 (7th Cir. 2011). However, that explanation for Grey's behavior carries less weight in light of the fact that he gave the same false story at his deposition in October 2020—three-and-a-half years after the incident occurred. In other words, Grey's willingness to lie in his deposition in 2020 when there was no longer a fear of retaliation greatly diminishes his claim that he lied out of fear in the first place. The

same is true of his trauma.  As harrowing as the events might have been, Grey offers no explanation for why he resumed telling the false account, and the court can only conclude that his decision to lie in his police interviews was improper in the first place.[12]  The court concludes that Grey has not presented any qualifying extenuating circumstances that might redeem his unlawful act of providing false reports to the police after witnessing a crime.  As such, the commission of an unlawful act provides a second and independent basis for the court to grant summary judgment in favor of defendants.

To summarize, the court finds that Grey gave false testimony during his deposition in this matter, which constituted "false testimony for the purpose of obtaining an immigration benefit."  The court further concludes that Grey lied to the police in mid-February of 2016, and regardless of whether the charge was expunged, the conduct constituted an unlawful act.  Since both the provision of false testimony and the commission of an unlawful act are statutory bars to possessing good moral character, the court denies Grey's motion for summary judgment and grants defendants' motion.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** defendants' motion for summary judgment and **DENIES** Grey's motion for summary judgment.

---

[12] Even if the court determined that the circumstances affected Grey in the way he claims, they arguably still do not excuse lying during an ongoing murder investigation.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 29, 2023**
**Charleston, South Carolina**